GREENE (UNITED STATES v.). See Case No. 15,258.

## Case No. 5,769.

### In re GREENEBAUM et al.

[1 Chi. Law J. 599.]

District Court, N. D. Illinois. May 25, 1878.

BANKRUPTCY—COMPOSITION WITH CREDITORS—SCHEDULE OF DEBTS.

[1. In accepting a composition of creditors all the court requires is to be satisfied that the creditors have been fully and honestly advised of the true condition of the debtor's affairs, so that the creditors have acted intelligently and understandingly in full view of the facts, and with a knowledge of their own rights in the premises.]

[2. The whole question of whether the composition should be accepted is relegated under the law to the necessary quorum of creditors, and if it appears that they acted intelligently and without undue influence, the court should confirm their action, unless subsequent disclosures are made, which it may be fairly presumed would, if known, have caused the creditors to act differently.]

[3. It seems that, where the requisite majority of creditors agree to a composition, the mere fact that some of that majority signed in a representative capacity, as assignees in bankruptcy, administrators, etc., is not a valid objection to the composition; for, as the receipts of administrators and assignees are sufficient, and if they sign for indebtedness due their estates without authority they become personally liable, it would seem that, in the absence of evidence, the court would presume them to be personally liable if they signed the composition without sufficient authority.]

[4. A bankrupt is not bound to schedule among his debts a contingent liability as a stockholder in a savings bank which has failed, when it does not appear that the bank will not pay in full, and there has been no judicial determination that the liability exists.]

[5. The fact that a bankrupt has failed to schedule all of his debts is not an insuperable obstacle to the confirmation of a composition, for he will only be discharged from the debts which have been scheduled, remaining personally liable for those which have been omitted.]

[In bankruptcy. On objections to the confirmation of composition proceedings in the matter of Henry Greenebaum. Elias Greenebaum, and David S. Greenebaum, bankrupts.]

Adolph Moses and Rosenthal & Pence, for bankrupts.

Fuller & Smith and E. A. Storrs, for objecting creditors.

BLODGETT, District Judge. I announced that I would dispose of the objections to the confirmation of the composition in re Greenebaum Brothers this morning. I regret that I have not had more time to investigate this case, although so far as I have gone I am satisfied that investigation would only strengthen the conviction and the conclusion to which I have arrived. The case has been made quite voluminous, and to some extent complicated, by the acts of the parties opposing the composition. Very voluminous depositions have been taken, and I have been obliged to read those, as far as possible, in fragments, here and there, getting at the substance of what had been eliminated by the depositions, and think that I pretty fully

understand all the questions of fact that have been made in the case.

In the month of December last, the firm of Henry Greenebaum & Co., consisting of Henry Greenebaum, Elias Greenebaum and David S. Greenebaum, filed their voluntary petition in bankruptcy in this court, and subsequently were duly adjudged bankrupts. In the month of February last, the bankrupts filed their petition, asking that a meeting of their creditors be called to consider propositions for compositions. The meeting was duly called to be held before H. N. Hibbard, Esq., one of the registers of this court, on the 8th day of March, 1878. This meeting was quite largely attended, the bankrupts being present. As, however, the affairs of the bankrupts were complicated, and the creditors numerous, many residing in Europe, the meeting appointed a committee of creditors to examine the books and affairs of the bankrupts, and adjourned to the 28th day of March last, at which time it was expected the committee would report. In the interval between the first and the adjourned meetings the bankrupts Henry and Elias were examined at great length, under oath, by attorneys representing creditors, and a very careful examination of their books and papers made by an expert accountant employed in behalf of creditors. At the adjourned meeting the committee reported the result of their examination, so far as the same had gone, and asked for a further adjournment, but the meeting, by a large vote, refused to adjourn for further examination, and proceeded to act on the propositions for composition. The bankrupts, however, offered themselves for examination, and in accordance with such offer, Mr. H. G. was examined in reference to his conveyances just prior to the failure. It appeared that the bankrupts had been, for quite a number of years past, engaged in business in the city of Chicago, as bankers and brokers and dealers in foreign and domestic exchange, under the firm name of Henry Greenebaum & Co., and had also conducted a similar business in New York City, under the firm name of Greenebaum Brothers & Co. They had also been largely interested in the German National Bank of this city, and the German Savings Bank, as managers and stockholders of said corporations. The whole number of their creditors, so far as at present disclosed, by their schedules and otherwise, is seven hundred and fifty-four, of whom three hundred and eighty-six are creditors for over $50 each; and the total amount of debts and liabilities scheduled amounted as shown to $442,137.53. The number of creditors present or represented at the meeting was one hundred and twenty-eight, representing debts to the amount of $218,000. The creditors assembled and represented at the adjourned meeting then proceeded to consider the proposition for composition, made by the bankrupts, which was an offer to pay 25 per cent. on the dollar of the amount due

from them to their respective creditors,—5 cents to be paid in cash within sixty days after the ratification of the composition, 10 cents in one year, and 10 cents in two years from the date of the ratification of the composition; the deferred payment to be evidenced by the joint and several notes of the bankrupts, and secured by a bond, to be approved by a committee of creditors, in the penal sum of $100,000,—and adopted a resolution to accept said composition, one hundred and fourteen of the creditors at the meeting voting in favor of accepting the composition, and only fourteen voting against it, the fourteen so voting in the negative representing about $34,000 of indebtedness. On the 2d of May inst. the proceedings of the creditors' meeting, duly certified by the register, were filed with the court, together with a confirmation of the composition, signed by two hundred and seventy creditors, representing about $322,000 indebtedness. A rule was entered requiring all persons interested to show cause on the 9th instant why the composition should not be ratified and confirmed by the court, and on the return day of the rule, Moses Bloom, Leopold Bloom, Simon Zacaries, Christoph Remelsburger and Peter Mars filed objections to the ratification of the composition.

These objections are substantially: (1) That the resolution was not legally adopted by the creditors' meeting. (2) That Elias Greenebaum has failed to schedule a large amount of his property, the proceeds of an undivided half of the assets of the late firm of Greenebaum & Foreman. (3) Because Elias Greenebaum, in fraud of his creditors, has heretofore attempted to transfer and assign to his wife all his interests in the assets of Greenebaum & Foreman. (4) Because both Elias and Henry had made preferences which were fraudulent under the bankrupt law. (5) That the bankrupts have failed to show by their schedules the names of all their creditors. I have not attempted to recite in detail the objections and specifications filed, but the substance of those urged upon the court or referred to in the proofs are grouped under the foregoing heads.

The main controversy in the case centers about two transactions.

1. It was disclosed that in 1874 Elias Greenebaum became a partner in the firms of Henry Greenebaum & Co. and Greenebaum Brothers & Co., contributing at that time a cash capital of about $250,000, besides $50,000 which those firms owed him previously: that Elias at, or just before he became a member of the firms, pretended to transfer to his wife, Rosina Greenebaum, the balance of his estate, amounting to about $250,000 to $300,000 more, and that said Rosina now claims to hold and control the assets so transferred to her, as against the present creditors of the bankrupts. The undisputed facts in regard to this seem to be these: Elias and one Gerhard Foreman had

been partners, doing business as loan brokers for several years prior to the spring of 1874 under the firm name of Greenebaum & Foreman. This firm had recently dissolved, for the purpose, it would seem, of enabling Elias to unite in business with his brothers. On the 16th of May he gave to his wife an agreement in writing, in the following language:

"Whereas, the copartnership heretofore existing under the firm name and style of Greenebaum and Foreman has been dissolved, and I, the undersigned, having been a member of said firm, and am about to enter into the firms of Greenebaum & Co., of Chicago, and Greenebaum Brothers & Co., of New York; and whereas I have promised my wife, Rosina Greenebaum, that prior to my entering into the aforesaid business relations I shall assign, transfer and set over unto her all my personal property and estate save and except the sum of $50,000, which sum I have agreed to contribute into the business firms which I am about to enter, and save and except the sum of $50,000 due me from Henry and David S. Greenebaum, which indebtedness is represented by two demand certificates, signed Greenebaum Brothers & Co., and bearing date April 7, 1873, and payable respectively January 1, 1876 and 1877, with annual interest at 7 per cent per annum: Now, therefore, in consideration of $1 to me in hand paid, I, Elias Greenebaum, of the city of Chicago, do hereby make, assign, and set over to my wife, Rosina Greenebaum, all my right, title and interest in and to the undivided assets of the late firm of Greenebaum & Foreman, which will be kept by said Foreman, at his office, in a separate safe, for collection and conversion, with my assistance and concurrence.

"P. S.—It is understood and agreed that should at any time any of the assets, by exchange, foreclosure, or settlement, be converted into real estate, and thereby the title of the interest of said Rosina Greenebaum be vested into Elias Greenebaum, then said Elias Greenebaum is either to transfer and convey the same to said Rosina Greenebaum, or pay therefor the amount of the original indebtedness." After making this paper, Elias has continued to collect and reinvest the funds referred to, and has received about $193,000 of his share of the assets of Greenebaum & Foreman, which he has kept in a separate account with Elias Greenebaum as trustee; but most of the time the securities have been under the control of his wife, and she, as between themselves, has been recognized as the owner, although Mr. Foreman knew nothing of it, and for some time it was not known to Henry Greenebaum. This gift, or transfer, it is claimed, was and is fraudulent and void as against the creditors of the bankrupt firms, and upon the facts surrounding this transaction is based the charge of fraud and concealment of assets by Elias. So far as Henry Greenebaum is concerned,

the main allegations are as to the unlawful preferences made by him just before filing the petition in bankruptcy. These charges are in substance that Henry conveyed a large amount of real estate, owned by him individually, to various firm creditors, and for the benefit of the German National Bank, in which he was interested, thereby defrauding his individual creditors, and also the creditors of the firm who would have shared in any surplus of his individual estate.

The admitted facts in regard to these transactions are, briefly, that in the early part of November the New York house became embarrassed, and after a visit to New York, Henry Greenebaum attempted, with the aid of his personal friends here, to raise funds to relieve the New York house. In order to do so, he obtained from eight prominent merchants of this city their notes for $10,000 each, and upon these he raised the money, about $50,000 of which went to the relief of the New York firm, and the balance was used about the affairs of the firm here and for the payment of his individual debts. A few days after, Henry executed to Herman Shaffner five trust deeds upon real estate, the title to which stood in his name; three to secure $10,000 each, payable in one year; two to secure $50,000, payable in two and three years; one to secure $25,000, payable in one year. It does not appear that it was expressly agreed that these conveyances were agreed upon or promised at the time these friends lent their credit to protect the bankrupt firms, but Henry Greenebaum testified that a portion of these securities were made to so secure those who had generously, as he says, come forward to help sustain the credit of his firm. Of these securities $80,000 were so appropriated, $25,000 was pledged at the Corn Exchange Bank to raise funds for the firm, and the other $50,000 note and security is turned over to the assignee. A day or two before the petition in bankruptcy was filed, Henry Greenebaum also executed an instrument declaring that he held title to certain real estate in trust for the German National Bank, and a similar instrument in favor of the German Savings Bank. An assignment was also made for nominal consideration of the interest of Henry Greenebaum in the leasehold interest and building on the corner of Lake and La Salle streets, subject to payment of ground rent and taxes, and a deed made to Nelson Morris of certain real estate in exchange for stock in the German National Bank. It is claimed that the transfer by Elias Greenebaum to his wife of one-half of the assets of Greenebaum & Foreman was fraudulent and void as against creditors, either existing at the time or subsequent, and that creditors should be allowed to test the validity of this transfer by proceedings in the name of an assignee in bankruptcy; that the conveyances by Henry Greenebaum to Shaffner were void as fraudulent preferences under the bankrupt act [of 1867 (14 Stat. 517)],

and creditors should be allowed to set them aside in the name of the assignee. With regard to the transactions between Elias and wife, it can hardly be claimed that these are void under any provision of the bankrupt law. At most, it can only be attacked by creditors as a partly executed or inchoate gift, the proof tending to show that since the alleged gift or assignment, Elias has exercised the general control over his interests in the old assets of Greenebaum & Foreman. But Mrs. Greenebaum has control and possession now of these assets, at least all that seem to have any present value, and they could only be reached at the end of a probably tedious and expensive litigation. The conveyances made by Henry Greenebaum upon the eve of the developed insolvency of his firms are perhaps of more questionable validity under the bankrupt law, and it is possible that some of them might be set aside as preferential. But it is obvious such a result could only be reached at the end of a series of lawsuits with the parties now interested in those conveyances.

All these facts were before the meeting of creditors. Most of them were to some extent developed at the first meeting, and they were thoroughly investigated by the committee between the first and the adjourned meetings. The committee consisted of able lawyers and astute, sagacious business men. They laid the results of their investigation before the adjourned meeting in an elaborate report, and the proofs now before me show that the report of the committee was elaborately and fully discussed. There is no charge that there has been any concealment or withholding of any fact necessary to be known by the creditors in order to enable them to act intelligently upon the proposition. An expert accountant was employed, who made a thorough examination of the books of both firms and laid the results of those investigations before the creditors at their last meeting, in tabulated form, easy to be understood by any business man. The amount of the assets and liabilities of the bankrupts, and the reasons for their losses were all explained as fully as any such transactions can probably ever be explained under such circumstances. All the facts in regard to the alleged preferences and the main and essential facts in regard to the gift assignment from Elias to his wife were fully discussed and understood by the creditors at the meeting, and the evidence taken by the committee has been accessible to all creditors ever since that meeting. The single question is, ought the court, for the reasons assigned, to refuse to gratify this composition? The creditors who have confirmed the composition by their signatures would seem to be largely of a class who are intelligent and capable on questions touching their own interests, a large proportion being bankers or business firms engaged in business in various parts of the country.

There is no pretext or evidence that any undue or improper influence has been brought to bear on creditors to secure their votes at the creditors' meeting, or signatures in confirmation. Since the amendments of 1874 [18 Stat. 178] to the bankrupt law, the right of a certain majority of the creditors of a bankrupt or insolvent debtor to control the bankruptcy proceedings has been one of the leading features of the law, and the constitutionality of such action has been amply sustained by the courts. It is hardly necessary to refer to the only authority on that subject, and that is the decision of Judge Hunt in Re Reiman [Case No. 11,675]. For illustration: No matter how flagrant or fraudulent acts of bankruptcy a debtor may have committed, it requires the concurrence of one-fourth in number of his creditors, representing at least one-third in amount of his debts, to commence and prosecute bankrupt proceedings against him. If more than three-fourths of a debtor's creditors representing the least fraction more than two-thirds of his debts, see fit to overlook the acts in bankruptcy, the minority is powerless; they cannot invoke the aid of the law in any respect. So, too, when a bankrupt asks for a creditors' meeting to submit proposals for a composition under the amendment of 1874, the creditors can undoubtedly condone acts of bankruptcy or even frauds of which their debtor has been guilty. This question was decided by Judge Wallace, of the Northern district of New York, in Re Allen [Case No. 210]. While I confess I should be loath to confirm a composition originating in fraud, as the learned judge stated to have been the fact in that case, I think there can be no doubt of the rule deducible from all the adjudications in the composition cases, that all the court requires is to be satisfied that the creditors have been fully and honestly advised of the true condition of the debtor's affairs, so that the creditors have acted intelligently and understandingly in full view of the facts, and with a knowledge of their own rights in the premises.

The whole question of whether the composition should be accepted is relegated under the law to the necessary quorum of the creditors, and if it appears that they acted intelligently and without undue influence, it seems to me the court should confirm their action, unless subsequent disclosures are made which it may be fairly presumed would, if known, have caused the creditors to act differently. The creditors of these bankrupts meet. They become aware that Elias Greenebaum, who was reputed the wealthiest of this firm of brothers in 1874, made a gift of half his substance to his wife, and that this fact has been kept concealed, at least not communicated, from the body of the creditors of these firms up to the eve of their bankruptcy. They also learn that the donee of the large amount of assets has them now, or the valuable portion of them, in her possession, and that she can only be made to

disgorge them at the end of a lawsuit, and are not even sure of that result. They learn that Henry Greenebaum, on the eve of his bankruptcy, gave certain securities which they are advised were preferential and void under the bankrupt law; but they also learn that those alleged preferences may be deemed the struggles of an over-sanguine business man, made in good faith under the belief that he could thereby tide his business affairs over a crisis, and thus save his credit and pay all his debts in full. Knowing, therefore, that if these alleged preferences are set aside, it will be after tedious and expensive proceedings in the courts, where the assets at present available may be consumed, or at least much diminished, without absolute assurance of success, they, the creditors, in view of all the surrounding facts, vote to accept the offer made by the bankrupts, condone the alleged frauds as a proper majority undoubtedly have the right to do, say they will take what is offered without further delay or expense, and forego the balance of the debt. This is what the creditors of the bankrupts have done by a very large majority under the circumstances. As I have already said, the total amount of debts is $442,137, in the hands of seven hundred and fifty-four creditors, of whom three hundred and eighty-six are creditors for $50 and over. Of these three hundred and eighty-six creditors two hundred and seventy had confirmed the composition, representing $322,000 of the debts. The law requires that the composition shall be confirmed by the signatures of two-thirds in number and one-half in value. Here is a majority of eleven over the required number, and over $100,000 in amount more than what is required. The majority at the creditors' meeting was very large. The number present at the meeting and voting was one hundred and twenty-eight; those voting for the composition, one hundred and fourteen, those voting against it, fourteen, and since the composition meeting four of the creditors who voted in the minority at that meeting have signed the confirmation of the composition. Those who have signed represent over $17,000, over half of the amount of the indebtedness, which was represented in the composition at the time of the meeting. But it is also claimed that the individual composition of Henry Greenebaum was not properly carried and confirmed, because at the meeting seven creditors voted, six of whom voted aye and one voted no. The whole amount in value of his individual debts represented was $63,199, but the debtor voting no, represented $11,000, leaving $52.000 voting in the affirmative. But it is claimed that this amount should be reduced by deducting the amount represented by the German National Bank, and that that vote should have therefore been excluded. I do not see the force of this objection. There is no question raised but what Henry Greenebaum owed the German

National Bank the amount of the indebtedness that was represented and voted for. Nor is there any charge made that any undue influence was brought to bear by Henry Greenebaum as the representive of the corporation to secure this vote. On the contrary, the proof shows that at the time this meeting was held, and at the time the vote was cast the German National Bank was in process of liquidation, winding up its affairs under the control of other parties than Henry Greenebaum, and that he had no special influence with the management of the bank at that time.

It is also objected that some of these creditors who have confirmed this composition by their signatures have acted as administrators or assignees in bankruptcy, and that therefore enough creditors have not confirmed it. A sufficient answer to this objection is that a careful inspection of the confirmation shows that only five, I think, of the creditors who have confirmed the composition have signed in any representative capacity, so that those claims may be all thrown out, and yet the requisite number of creditors, both in number and amount will be shown. But it may be further questioned whether the court would not presume, in the absence of evidence, these parties to be personally liable. The receipt of an assignee is sufficient, and the receipt of an administrator is sufficient, and if they sign for indebtedness due the estates which they represent without sufficient authority, they simply make themselves personally liable. So that upon two grounds this objection would be overruled.

It is further objected that the bankrupts have failed to schedule all their creditors. This is based upon the fact that the evidence shows that they were stockholders in the German Savings Bank and in the German National Bank, and that a contingent liability exists from them as such stockholders to the creditors of these corporate institutions. A sufficient answer to that criticism is that it is not definitely ascertained or known, certainly not judicially determined, that any such liability will ever be attempted to be enforced, or will arise; it does not appear but what both these institutions may pay in full, nor does it appear from any evidence that there is any personal liability on the part of the stockholders in the German Savings Institution. But even if it were so, the debtors in a composition proceeding are only discharged from those debts which they schedule, and if they fail to schedule this indebtedness or this contingent liability which rests upon them as stockholders in these corporations, they will not be released from personal liability. They will only be released from their liability to creditors who are named in their schedule.

For these reasons which I have thus carefully gone over, I am satisfied that no sufficient reason has been assigned why this composition should not be confirmed. The una-

nimity of the creditors' meeting, the large number of creditors, considering the scattered condition of the creditors of this firm throughout this country and Europe, the large number of creditors who have confirmed the composition by their signatures, all tend to convince me that the business men who looked at the affairs of this concern, who have investigated its assets and liabilities, are satisfied that as a business proposition it is better for them to accept the offer that is made. The offer is a peculiar one, but at the same time is such an one as is for the creditors themselves to say whether it is satisfactory or not. And the minority, while they may be satisfied that fraud has been perpetrated, that preferences have been given, that Elias Greenebaum has in this transaction, as between himself and his wife, saved a large proportion of his estate, which he will hereafter enjoy with his wife, yet those facts were all before the creditors; they knew what they were, knew what the objections were, and considered them. The court must believe that with the aid of the able lawyers who have contested this composition from the outset, who have met and argued questions of law and submitted proofs to the creditors—that this question must have been fully considered in all its aspects by the creditors, and that they acted intelligently and understandingly. The objections to the composition will therefore be dismissed and the composition confirmed. Composition confirmed.